IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 09-50173-TUC-RCC(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Ira L. Moore, | |
| Defendant. | |

On January 19 and 28, 2010 and February 4, 2010, upon consent of Defendant Ira L. Moore, this matter came on for evidentiary hearing on a Petition to Revoke Supervised Release (Doc. No. 4) (hereinafter "Pet., Alleg. _ at p. _"). Probation Officer Mr. Max Richards (hereinafter "Richards at p. _") and Tucson Police Detective Steve Erdman (hereinafter " Erdman at p. _") testified for the Government. Defendant's cousin Ms. Tamara Rae (hereinafter "Rae at p. _") testified[1] for Defendant.

---

[1] Ms. Rae testified briefly on January 21, 2010. The Court ceased questioning of Ms. Rae by defense counsel when it appeared that the witness could possibly incriminate herself as an accomplice of Defendant in Count 17, First Degree Hindering Prosecution, and Count 19, Tampering With Physical Evidence, of the indictment (Government Exhibit 1) presently filed against Defendant in Pima County Superior Court CR 20093605-003. The Court ordered that an attorney be appointed to represent and advise Ms. Rae regarding her 5th Amendment right not to incriminate herself and the hearing was continued to January 28, 2010. (*See* January 19, 2010 Transcript, at pp. 78-84 (Doc. No. 22)). Ms. Rae did not appear on January 28, 2010 and the evidentiary hearing was continued to February 4, 2010. Ms. Rae appeared with counsel, Mr. Joel Parris, on February 4, 2010 at which time she invoked her 5th Amendment right not to incriminate herself and Ms. Rae was released from giving further testimony. (*See* February 4, 2010 Transcript at pp.2-4 (Doc. No. 26)).

Transcripts of the January 19 and February 4, 2010 evidentiary were ordered by the Magistrate Judge, filed on February 9 and 11, 2010 (Doc. Nos. 22 and 26), and are forwarded to the District Court for review.

Thirteen exhibits were admitted into evidence: (1) Government Exhibit 1: Pima County Superior Court Indictment CR 20093605-003; (2) Government Exhibit 2: CD of taped interview of Defendant; (3) Government Exhibit 2a: a transcript of Government Exhibit 2; (4) Government Exhibit 3: Photo of front of Defendant's house at night; (5) Government Exhibit 4: Photo of Defendant's carport in the day with Ms. Rae's white Nissan Altima parked therein; (6) Government Exhibit 5: Photo of items taken out of Ms. Rae's vehicle trunk; (7) Government Exhibit 6: Photo of two Glock firearms found among items taken out of Ms. Rae's vehicle trunk; (8) Government Exhibit 7: Photo of wood-stocked AK-47 assault rifle found among items taken out of Ms. Rae's vehicle trunk; (9) Government Exhibit 8: Photo of AR-15 assault rifle found among items taken out of Ms. Rae's vehicle trunk; (10) Government Exhibit 9: Photo of entryway into Defendant's house; (11) Government Exhibit 10: Photo of Glock firearm found under livingroom couch of Defendant's house; (12) Government Exhibit 11: Photo of vehicle in backyard of Defendant's house later determined to be stolen; (13) Government Exhibit 12: Photo of items in Ms. Rae's vehicle trunk; and (14) Defense Exhibit A: a transcript of taped interview of Government Exhibit 2.[2]

---

[2] At the conclusion of testimony on February 4, 2010, Defendant moved to introduce a transcript (Defense Exhibit A) of Government Exhibit 2 (CD of taped interview of Defendant). (Doc. No. 27 at pp. 5-6). The Government objected to its admission. (*Id.* at pp. 6-7). The Court took under advisement whether to admit into evidence Defense Exhibit A. (*Id.* at p. 8). The Government was given leave to review Defense Exhibit A and Government Exhibit 2 and to submit a revised copy of Defense Exhibit A to the Court, at which time the Court would take under advisement whether to admit the Government's revised copy of Defense Exhibit A. (*Id.*). Defendant did not voice any objection. On February 16, 2010 the Government submitted to the Court a revised copy of Defense Exhibit A. After review of Defense Exhibit A and comparison to Government Exhibit 2, Defense Exhibit A is admitted into evidence. After review of the Government's revised copy of Defense Exhibit A and comparison to Government Exhibit 2, it is admitted into evidence as Government Exhibit 2a.

After consideration of testimony presented, Exhibits admitted into evidence, and argument of respective counsel, the Magistrate Judge recommends that the District Court find that Defendant violated his conditions of supervised release.

**I. BACKGROUND**

A. District of Colorado Sentencing

On March 19, 2001, Defendant was sentenced by U.S. District Court Judge Walker D. Miller in the United States District Court for the District of Colorado. Defendant was sentenced to concurrent terms of 78 months incarceration for Count 1, Hobbs Act Robbery in violation of 18 U.S.C. §§1951(a) and 2; Count 4, Unlawful Possession of a Machine Gun, in violation of 18 U.S.C. §§922(o)(1) and 2; and Count 5, Possession of a Weapon by a Prior Offender, in violation of 18 U.S.C. §922(g)(1). Defendant was sentenced to 60 months incarceration for Count 2, Use and Carry of a Firearm In Relation to a Crime of violence, in violation of 18 U.S.C. §§924(c)(1) and 2, to run consecutive to the 78 months imposed in Count 1, Hobbs Act Robbery. The total sentence of incarceration was a term of 138 months. The District Court recommended to the Bureau of Prisons that Defendant be designated to a facility in the District of Arizona. *See* United States District Court, District of Colorado, 98-CR-193-02-WDM Judgment and Commitment Order.

Upon release from imprisonment on June 29, 2008, Defendant was ordered to commence supervised release for a term of 60 months on Count 2 to run concurrent with a term of 36 months supervised release on Counts 1, 4 and 5. The District Court for the District of Arizona approved transfer of jurisdiction on August 21, 2009.

B. Defendant's Supervision In the District of Arizona

Defendant's conditions of supervised release were explained to him by Probation Officer Mr. Max Richards (hereinafter "PO Richards"), his supervising probation officer, on May 4, 2009. (Richards at p. 52). Among conditions of release explained to Defendant were Standard Condition No. 1, wherein he was not to commit any federal, state or local crime; and Standard Condition No. 16, wherein Defendant is not to possess firearms or ammunition. (*Id.* at p. 53). Defendant never indicated that he did not understand his

conditions of supervised release. (*Id.* at pp. 53-54). Defendant signed an acknowledgment of his conditions of release in the presence of PO Richards. (*Id.* at p. 54).

## II. DISCUSSION

### A. Petition To Revoke Supervised Release

The Government alleges that Defendant violated Standard Condition No. 1 of supervised release, which states:

> You shall not commit another federal, state, or local crime during the term of supervision.

(Pet., Alleg. A at p. 1). The Government alleges that factually:

> On September 9, 2009, the offender committed obstructing a criminal investigation, possession of stolen property, and prohibited firearms possession. Tucson police seized five weapons from the offender's residence and a stolen vehicle located on his property. This is evidenced by statements made to Tucson police and U.S. Probation Officer Max C. Richards and reported in Tucson Police Department [R]eport 0909090055.

(*Id.*). Further, the Government alleges that Defendant violated Standard Condition No. 16 of supervised release, which states in pertinent part:

> If you have been convicted of a felony, you shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon....Possession of a firearm will result in mandatory revocation of your term of supervision....

(Pet., Alleg. B at p. 2). The Government alleges that factually:

> On September 9, 2009, the offender possessed firearms as evidenced in Tucson Police Department Report 0909090055.

(*Id.*).

### B. Testimony[3] and Evidence

In the evening of September 8, 2009, an armed robbery occurred at a CVS pharmacy located at 865 E. Grant Road in Tucson, Arizona. (Erdman at pp. 10, 33-34; Richards at p. 55). Arrested in the vicinity of the CVS pharmacy for the robbery were Defendant's son

---

[3] All testimony cited in this section is contained in the January 19, 2010 transcript (Doc. No. 22).

Tynerial Kindred (hereinafter "Tynerial") and Tynerial's cousin Armante Franklin. (hereinafter "Armante"). (Erdman at pp. 11, 16, 34). Both were suspected of being involved in other robberies. (*Id.* at pp. 35-36). Tucson Police Department Detective Steve Erdman (hereinafter "Det. Erdman") was assigned to investigate the armed robbery occurring at the CVS pharmacy. (*Id.* at p. 10). As part of his investigation he sought to determine where Tynerial resided, in an attempt to find fruits and instrumentalities of prior robberies in which Tynerial may have been involved. (*Id.* at pp. 10, 36). Tynerial's residential address was determined to be 1001 S. Van Buren in Tucson, Arizona where Defendant also resided. (*Id.* at pp. 11-12; Defense Exhibit A at p. 10, hereinafter "Def. Exh. at p. _"; Government Exhibit 2a at p. 10, hereinafter "Gov. Exh. 2a at p._").

Det. Erdman and Tucson Police Department Detective Haines (hereinafter "Det. Haines") arrived at 1001 S. Van Buren on September 9, 2009 at approximately 1:00 p.m. (Erdman at pp. 12, 14-15). Before parking his vehicle, he drove by the residence and saw Defendant walk from the carport to the mailbox. (*Id.* at pp. 12, 13). He also saw a white Nissan Altima backed up in the carport. (*Id.* at p. 13). Det. Erdman initially spoke to Defendant in the front yard of the residence while Detective Haines entered the residence to speak with two females therein. (*Id.* at p. 14). The two females were determined to be Defendant's cousin Ms. Tamara Rae (hereinafter "Ms. Rae") and Tynerial's girlfriend Valerie. (*Id.* at p. 14, Rae at p. 77). It was determined that Ms. Rae was the owner of the white Nissan Altima backed up in the carport. (Erdman at p. 15). There were two IROC Camaros, one black and one red, parked at Defendant's residence. (*Id.* at p. 13).

Defendant, Ms. Rae and Valerie were advised that application for a telephonic search warrant for the residence and the vehicles on the premises had been made and that the females would be allowed to leave. (*Id.* at pp. 14, 15). However, anyone leaving the residence in a vehicle would be first asked for consent to search that vehicle. (*Id.* at p. 15).

Defendant was allowed to drive Ms. Rae, Tynerial's girlfriend Valerie, and Tynerial's and Valerie's baby, in a black IROC Camaro, to another location. (Erdman at p. 18). While Defendant was gone, Defendant's 13 year-old Tavaris, came home from school at 2:30 p.m.

(*Id.* at p. 19; Rae at p. 77). Defendant returned to the residence at approximately 3:00 p.m. (Erdman at p. 19). Det. Erdman interviewed and tape recorded[4] this second conversation with Defendant. (Def. Exh. A; Gov. Exh. 2a). The taped interview with Defendant occurred at 3:00-3:30 p.m. (Erdman at p. 20).

Defendant explained to Det. Erdman that he had been called earlier on September 9, 2009 by his cousin Anthony, who is Armante's father. (*Id.* at p. 16: Def. Exh. A at p. 3; Gov. Exh. 2a at p. 3). Anthony stated to him that he had called the Tucson Police Department to get information regarding his son Armante. (Def. Exh. A at p. 3; Gov. Exh. 2a at p. 3). Anthony called Defendant out of concern for the whereabouts of his son Armante, who had been out with Tynerial the night before but had not come home. (Erdman at p. 16).

Ms. Rae testified that on September 9, 2009, she was intending to go to Defendant's residence. (Rae at p.77). Defendant called Ms. Rae stating that a cousin had called him and that "something was going on with Tynerial."(*Id.*). She drove to Defendant's residence. (*Id.*). A cousin called at Defendant's residence and she learned that Tynerial and Armante "had got[ten] into some trouble the night before...." (*Id.* at pp. 78).

Defendant stated to Det. Erdman that he went into his son's bedroom to take "some items in order to prevent his son from getting in some kind of trouble with the police." (Erdman at pp. 16-17). Defendant put those items into Ms. Rae's white Nissan Altima trunk. (*Id.* at pp. 16-17, 25; Def. Exh. A at pp. 1-2; Gov. Exh. 2a at pp. 1-2). One of the items handled by Defendant was a rifle that he put into a case, a holster, ammunition, and a bullet-proof vest. (Def. Exh. A at pp. 2-3; Gov. Exh. 2a at pp. 2-3). Defendant also stated there were other things in pillow cases which he put in the trunk but did not give specific information regarding what those items were. (Erdman at p. 30). It was intended that Ms. Rae was to drive her white Nissan Altima, with the items Defendant had placed in its trunk, from Defendant's residence. (*Id.* at pp. 17-18).

---

[4] It is not clear from hearing the tape-recorded conversation and review of the transcript of such (Defense Exhibit A; Gov. Exh. 2a) whether Defendant was *Mirandized* prior to being interviewed or if the interview was recorded surreptitiously.

On September 9, 2009 at 2:00 p.m., PO Richards was called and advised by Detective Haines that Defendant's son Tynerial had been arrested the night before and that law enforcement were then presently at Defendant's residence awaiting a search warrant. (Richards at p. 54). In the 24 hours preceding the call from Detective Haines, PO Richards had not received a call, text message, voice message, e-mail, or any other communication from Defendant or anyone related to Defendant. (*Id.* at pp. 54-55). Defendant did, however, call PO Richards on September 9, 2009 between 2:00 to 2:30 p.m., while PO Richards was en-route to Defendant's residence. (*Id.* at pp. 54, 56).

The trunk of the white Nissan Altima was opened at 6:00 p.m. pursuant to a search warrant. (*Id.* at pp. 19-20). Pursuant to the search warrant Det. Erdman searched and found a loaded Glock firearm, with a round in the chamber, under a couch near the entryway to Defendant's residence. (*Id.* at pp.20, 21, 27; Gov. Exh. 9 and 10).

Government Exhibits 3 and 4 show the white Nissan Altima backed into the carport of Defendant's residence. (Erdman at p. 24). Government Exhibit 5 shows the items taken out of the white Nissan Altima trunk placed behind the vehicle. (*Id.* at pp. 24-25). Those items are: (1) two Glock firearms: one in a duty belt and one in a box. (*Id.*; Gov. Exh 6). Det. Erdman does not know if the guns were loaded but does know that there was ammunition in the magazines. (Erdman at p.26); (2) an AR-15 assault rifle (Erdman at p. 27; Gov. Exh. 8); (3) a wood-stocked[5] AK-47 assault rifle. (*Id.* at pp. 26-27; Gov. Exh. 7). It was determined that the Glock firearm in the duty belt and the AR-15 assault rifle were taken in the burglary of a Pima County Sheriffs deputy's home. (Erdman. at pp. 31, 43-44).

---

[5]The following exchange occurred between Det. Erdman and Defendant regarding one of the items placed in the white Nissan Altima trunk:
| | |
|---|---|
| Det. Erdman: | It's a gun thing? |
| Defendant: | Say it again? |
| Det. Erdman: | Like a taser or something? |
| Defendant: | No. It's a, you know, *one of them got wood on it* and the other one's like you say is, uh,-- |
| Det. Erdman: | Oh, like a nightstick, like a spinning nightstick or something? |

(Def. Exh. A at p. 12).

A Pontiac Firebird, later determined to be a stolen vehicle, was found in the backyard of Defendant's residence. (*Id.* at p. 28; Gov. Exh. 11). Det Erdman has no information that Defendant knew the Pontiac Firebird was stolen. (Erdman at p. 49).

Defendant's reason for not calling law enforcement: "Like I said, I don't know, I don't know what I was on exactly; I just was like f**k what am I going to do, you know. 'Cause like I said, it's just like - don't be misunderstood, if uhm, if, uh, if you come from where I come from and something like that happened to your son, I don't know, my mind doesn't say call the cops on him, you know what I'm saying, but - - although, although, uh, you know, uh, you know, *we need this shit*[?][6].[I]t's just you just want to man, what the f**k man, I want to chastise him first off. You know, I want to chastise him and then I want to tell him the, the spot he got me in." (Def. Exh. A at pp. 13-14; Gov. Exh. 2a at pp. 13-14)(emphasis added).

Defendant stated to Det. Erdman that he did not know that guns were in his son's bedroom until the morning of September 9, 2009 when he went into the bedroom and saw them there. (Erdman at p. 36). Defendant never said he had help[7] in moving items out of his residence. (*Id.* at p. 37).

Defendant shared and paid one-half of the rent for the 1001 S. Van Buren residence with his son Tynerial. (Def. Exh. A at p. 10; Gov. Exh. 2a at p. 10). Defendant and Tynerial kept to their separate bedrooms. (Def. Exh. A at pp. 10-11; Gov. Exh. 2a at pp. 10-11). There was no evidence proffered by the Government that linked Defendant to the Glock firearm found under the couch near the entryway, i.e., an area used in common by Defendant and others residing in the residence.

---

[6]A careful listen to Defendant's inflection and intonation in the phrase "*we need this shit*" indicates a rhetorical question by Defendant to himself rather than a literal admission of desiring firearms and ammunition. Thus, the Court inset a bracketed "?" after the phrase.

[7]The closest that Defendant alludes to having help in removing items from his son's bedroom is when he stated to Det. Erdman: "So, uhm, and, uh, *I just*, uh, *told her to give me*, uh, you know, I put stuff in pillow cases and stuff like that, and then just put the shit in the car." (Def. Exh. A at p. 3; Gov. Exh. 2a at p. 3).

C. Analysis

Defendant does not raise justification as an explanation for his having removed firearms and ammunition from his son's bedroom to the trunk of his cousin's vehicle. Justification for Defendant's transitory possession of firearms and ammunition would require evidence that Defendant: (1) was under unlawful and present threat of death or serious bodily injury; (2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) had no reasonable legal alternative; and (4) there was a direct causal relationship between the charged criminal conduct and the avoidance of the threatened harm. *See* 9th Cir. Model Crim. Jury Instr.-Justification 8.60 (2003); *see also,* e.g., *United States v. Beasley*, 346 F.3d 930, 933 n. 2 (9th Cir. 2003)(*citing United States v. Gomez*, 92 F.3d 770, 775 (9th Cir. 1996)). Herein, Defendant was not under an unlawful and present threat of death or serious bodily injury from anyone. Defendant intentionally placed himself in the situation of moving firearms and ammunition from his son's bedroom to the trunk of his cousin's vehicle. Defendant had reasonable legal alternatives: he could have called the police or PO Richards[8]. There was no link between Defendant's possession of the firearms and ammunition and a perceived harm.

It is the outright possession only, however brief or fleeting, of the firearms and ammunition by Defendant that need be proven by the Government against Defendant. *See United States v. Johnson*, 459 F.3d 990 (9th Cir. 2006), *cert. denied* 549 U.S. 1266 (2007); *United States v. Nolan*, 700 F. 2d 479, 484 (9th Cir. 1983)("the courts have ruled that federal firearms laws impose something approaching absolute liability.").To require otherwise

---

[8]Regarding alternatives available to Defendant, PO Richards testifies:

| | |
|---|---|
| [Defense Counsel]: | Didn't touch anything, calls first. |
| [Witness PO Richards]: | If he had called me first or called the police, yes, that would - - to me, in my opinion, if he had called me and said look, I know that my son was involved in this, he's got these weapons or whatever stuff like that, I haven't touched them or anything like that, then that would be the right thing to do. |

(Richards at p. 70).

would invite the Government to litigate Defendant's motives, reasons and good faith in possessing the firearms and ammunition. *Johnson,* 459 F.3d at 997 (*citing United States v. Gilbert*, 430 F.3d 215, 219 (4th Cir. 2005)).

It is Defendant's own conduct that establishes his knowing possession of firearms and ammunition on September 9, 2009. It is a phone call from Defendant's cousin Anthony to Defendant that provoked Defendant's concern for his son Tynerial. It is that phone call that prompted Defendant to call his cousin Ms. Rae, who was going to his house anyway, regarding concern for his son. It is that phone call that prompted Defendant to go to his son's bedroom to take "some items in order to prevent his son from getting in some kind of trouble with the police." Defendant then removed from his son's bedroom two Glock firearms, loaded magazines, a wood-stocked AK-47 assault rifle he placed in a case, an AR-15 assault rifle, and a bullet-proof vest. Defendant was not specific with Det. Erdman regarding the items put in pillow cases. However, there are only three explanations possible: (1) he put those items in the pillow cases himself; (2) he instructed another of the nature of items to be put in the pillow cases; or (3) the other person divined what Defendant wanted removed. In any event, by his own admission to Det. Erdman, Defendant alone carried the pillow cases and the AK-47 assault rifle. He enlisted his cousin Ms. Rae to drive away from the residence in her white Nissan Altima with the firearms and ammunition in the trunk.

## **III. CONCLUSION**

Based upon the aforesaid, the Court FINDS by a preponderance of the evidence that

1. Defendant violated:

    A. Standard Condition No. 1: " You shall not commit another federal, state, or local crime during the term of supervision."

        a. On September 9, 2009, Defendant *did obstruct and hinder a criminal investigation* of Defendant's son Tynerial Kindred by removing firearms and ammunition from his son's bedroom, placing such in the trunk of Ms. Rae's vehicle, to be driven away by her from Defendant's residence.

b. On September 9, 2009, Defendant *did possess stolen property*, i.e., a Glock firearm, a duty belt, and an AR-15 assault rifle stolen from a Pima County Sheriffs deputy.

c. On September 9, 2009, Defendant *did possess firearms*, i.e., two Glock firearms, an AR-15 assault rifle, and an AK-47 assault rifle taken out of the trunk of Ms. Rae's white Nissan Altima and is a prohibited possessor.

d. There is *no evidence* before this Court that on September 9, 2009 Defendant possessed a stolen Pontiac Firebird found in the backyard of Defendant's residence. The Government concedes as much. (February 4, 2010 Transcript at pp. 15-16 (Doc. No. 26)).

e. There is *no evidence* before this Court that on September 9. 2009 Defendant possessed a Glock firearm found under a couch in the entryway of the house shared with Defendant's son Tynerial and Tynerial's girlfriend Valerie.

2. Defendant violated:

A. Standard Condition No. 16: "If you have been convicted of a felony, you shall refrain from possessing a firearm, ammunition, destructive device, or other dangerous weapon...Possession of a firearm will result in mandatory revocation of your term of supervision...."

a. Defendant *has been previously convicted* of the felonies enumerated in the Petition to Revoke Supervised Release.

b. On September 9, 2009, Defendant *did possess* two Glocks and two magazines with ammunition associated with the two Glock firearms, an AR-15 assault rifle, and an AK-47 assault rifle.

## IV. RECOMMENDATION

Upon review of the entire record in this matter, the Magistrate Judge recommends that the District Court find by a preponderance of the evidence that Defendant: did violate Standard Condition No. 1 (Allegation A) to the extent that Defendant did obstruct and hinder a criminal investigation; did possess stolen property consisting of a Glock firearm, duty belt

and AR-15 assault rifle; did possess firearms consisting of two Glock firearms, an AR-15 assault rifle, and an AK-47 assault rifle. Moreover, Defendant did violate Standard Condition No. 16 (Allegation B) in that Defendant is a convicted felon and prohibited possessor having possessed two Glock firearms, an AR-15 assault rifle, and an AK-47 assault rifle. Violation of Standard Condition No. 16 mandates revocation of Defendant's term of supervised release pursuant to 18 U.S.C. §3583(g)(2).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. If objections are filed, parties should use the following case number: **CR 09-50173-TUC-RCC**.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 22nd day of February, 2010.

_____
Héctor C. Estrada
United States Magistrate Judge